UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALEXANDER AKSANOV,

      Plaintiff,

      v.

HARRAH'S CASINO HOTEL ATLANTIC
CITY, et al.,

      Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 10-5883
(JEI/AMD)

**OPINION**


**APPEARANCES:**

TOMPKINS, MCGUIRE, WACHENFELD & BARRY, LLP
By:  Grant W. McGuire, Esq.
3 Becker Farm Road, Suite 402
Roseland, New Jersey 07068-1726
              Counsel for Plaintiff

LAW OFFICES OF RILEY & RILEY
By:  Michael E. Riley, Esq.
The Washington House
100 High Street, Suite 302
Mount Holly, New Jersey 08060
              Counsel for Defendants Logan, Palamaro, and City of
              Atlantic City


**IRENAS**, Senior United States District Judge:

In the early morning of November 16, 2008, Plaintiff

Alexander Aksanov ("Alex"[1]) sustained serious injuries, including a

---

[1]  The Court departs from its usual custom of referring to parties
by their last name to distinguish Alex Aksanov from his brother,
Andrew Aksanov.

several inches-long gash across his forehead.  For the purposes of this motion only, the Court accepts as true Alex's deposition testimony that settling Defendants Harrah's Casino and Hotel security guards severely beat Alex while he was patronizing the nightclub within the hotel.[2]

It is undisputed, however, that non-settling Defendants, Atlantic City Police Officers Logan and Palamaro, did not participate in the beating.  The principal issue raised by the non-settling Defendants'[3] instant summary judgment motion is whether the police officers violated Alex's constitutional rights when they failed to intervene in the beating inflicted by non-state actor, private, security guards.  Applying the principles set forth in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989) and its progeny, the Court holds that the police officers did not violate Alex's Fourteenth Amendment Due Process rights.

---

[2]  There is conflicting evidence in the record on this point.  Most notably, both Officer Logan and Officer Palamaro testified that no one from Harrah's security hit or otherwise used any force on Alex (Logan Dep. p. 20-21, 39, 53; Palamaro Dep. p. 18, 25).

However, Harrah's security footage undisputedly shows a large bloody gash on Alex's forehead, and Alex was admitted to the hospital the next day with severe injuries to his head, neck, back, shoulders, hip, knee, and chest, as well as a concussion. (Alex Aksanov Dep. p. 175-79)  As will become apparent from the discussion of the record evidence *infra*, the only people who could have inflicted the bulk of these injuries were Harrah's security.

[3]  The remaining Defendants are Officers Logan and Palamaro, as well as the City of Atlantic City.

The Court also holds that Alex's other excessive force and state law tort claims have no merit.  Accordingly, Defendants' Motion for Summary Judgment will be granted.

**I.**

To celebrate Plaintiff Alex Aksanov's 30th birthday, Alex, his girlfriend at the time (apparently now his wife), his younger brother Andrew, and some friends, reserved rooms at Harrah's Hotel and Casino for the night of November 15, 2008.  They went out to dinner at a high-end restaurant, and then went to the nightclub in Harrah's known as "The Pool."

It was undisputedly dark, crowded and loud at the nightclub when the group entered around 10:30 p.m. (Alex Aksanov Dep. p. 62) A D.J. was playing music and a reality television star was in attendance.  Alex and his party reserved a cabana, which required a minimum purchase of five bottles of alcohol.  (Id. at p. 55) The group drank Grey Goose vodka, which they mixed with juice themselves.  Alex testified that he drank "two, maybe three" drinks during the course of the night (Id. at p. 67), but there is no evidence in the record concerning the size of his servings.

Around 2:30 a.m., an "altercation" or "scuffle" occurred in the pool area of the nightclub. (R. Driggs Dep. p. 14)[4]  The details of the encounter differ.

According to Alex and his brother Andrew, Alex stepped between Beatriz Driggs and Andrew after Mrs. Driggs began to hit Andrew on his face and head. (Alex Aksanov Dep. p. 74-79; Andrew Aksanov Dep. p. 31-33)  Alex testified that he held his brother back with his left arm. (Alex Aksanov Dep. p. 78)  Andrew testified that Alex "kind of put his arm on me and pushed me over and like got in between." (Andrew Aksanov Dep. p. 36)

According to Mrs. Driggs and her husband, Alex "pushed" over a table occupied by the Driggs, breaking the bottle of vodka and Mrs. Driggs' camera which were on the table. (R. Driggs Dep. p. 40-41; B. Driggs Dep. p. 57-58)

Either way, there is no dispute that Harrah's security immediately descended upon Alex to restrain him.  At least five (B. Driggs Dep. p. 58), and perhaps as many as "a dozen" (Alex Aksanov Dep. p. 96, 106), security personnel tackled Alex, grabbing him by both arms, his legs, and around his waist.  They "dragged" him toward a double-doored service entrance (i.e., non-

---

[4]  Notably, no one who was involved in, or witnessed, the incident characterized the incident as Alex being involved in a "fight." Indeed, one witness specifically said it was not a fight.  (R. Driggs Dep. p. 14)

4

public entrance) as they "took shots on [Alex's] torso."  (Alex Aksanov Dep. p. 91-92)

By all accounts, Alex was screaming.  Alex states that he was screaming, "I'm not resisting.  You're using excessive force." (Alex Aksanov Dep. p. 101)  Mrs. Driggs testified that she observed Alex "screaming" and "fighting back" against security. (B. Driggs Dep. p. 62)  Officer Logan, who had just arrived at the scene, observed security "holding back" Alex while Alex yelled "foul obscenities."  (Logan Dep. p. 13)

Once Alex was removed through the service entrance into a hallway, he was surrounded by approximately ten black-shirted security guards, while Officers Logan and Palamaro-- undisputedly in full police uniform, and on duty as police officers-- stood back watching.  (Alex Aksanov Dep. p. 107-09)  Alex testified that at this time, he was standing, his hands up in the air, saying "'whatever you're looking for it's not me . . . and I'm not resisting guys.'"  (Alex Aksanov Dep. p. 110)

Officer Logan then asked Alex for his wallet and identification, and Alex undisputedly complied.  (Alex Aksanov Dep. p. 112; Logan Dep. p. 70-71)  Officer Logan testified that, at this time, he saw the bleeding gash on Alex's head.  (Logan Dep. p. 72)

According to Alex, after he handed over his wallet, a security guard punched him in the jaw, which led to other security

5

personnel grabbing the back of his head, kneeing him in the face, stomping on his hands, and slamming his head into the concrete floor, all while making anti-Semitic comments about Alex. (Alex Aksanov Dep. p. 113-121)

The entire time, Officers Logan and Palamaro "were there watching." (Alex Aksanov Dep. p. 120)

When a security officer pushed Alex up against the wall, Alex managed to choke out the words "stop this" to Officer Logan, but Officer Logan said, "'[i]t's not my call.'" (Alex Aksanov Dep. p. 123)[5] Officer Palamaro allegedly laughed, "look[ed] at Logan [and] sa[id] [an anti-Semitic comment] to Logan." (Id. at p. 125)

Then security threw Alex to the ground and pinned him down to place handcuffs on him. Alex testified that he saw Officer Palamaro give his handcuffs to Security Officer Rivera who then placed the cuffs on Alex's wrists. (Alex Aksanov Dep. p. 128)

When Rivera lifted Alex up by the handcuffs, Alex "screamed" in pain that his rotator cuffs were torn. (Alex Aksanov Dep. p. 129) Alex further testified:

> A:  . . . Rivera put me into the wall, put my torso and
> my face into the wall, pressed up against the wall and
> then Palamaro grabbed me by the cuffs from behind and
> started pulling, pushing down on the cuffs and with his
> shoulder slamming my torso into the wall.

---

[5]  Logan testified that he and Officer Palamaro were on duty that night to "provide a back-up for security" and to "provid[e] additional protection to the employees of Harrah's in case a situation had occurred." (Logan Dep. p. 24-25, 12)

Q:  Was [Palamaro] saying anything to you as he was doing this?

A:  Shut-up.

Q:  What were you saying when Palamaro was saying shut up?

A:  I was in pain.

Q:  So did you say anything?

A:   Same, I tore my rotators, my rotators, please take the cuffs off, my rotators.

Q:  What proceeded to happen next?

A:  . . . Rivera . . . grab[bed] me again and then took me to the holding cell area.

(Alex Aksanov Dep. p. 130-31)

After staying in the holding cell for a time, Alex was taken by security to the nurse's station where they removed his handcuffs.  (Alex Aksanov Dep. p. 138)  After the nurse treated and released Alex, Officer Logan issued him a ticket for disorderly conduct.  (Id. at p. 141; Logan Dep. Ex. 1)  That charge was ultimately resolved in Alex's favor.

Alex was then allowed to return to his room until the morning, at which time he checked out of the hotel and went to the Atlantic City Police Department to file a complaint against Harrah's security personnel.  The Complaint Form, filed at 11:45 a.m., on November 16, 2008, asserts that "about 9" Harrah's "security guard[s]" beat Alex, stole his phone, and broke his

"$5,000 watch." (Riley Cert. Ex. D) Alex made no complaint concerning the police officers.

As soon as Alex returned to his home in Northern New Jersey later that day, he went to the hospital to receive treatment for his injuries. (Alex Aksanov Dep. p. 162) He refused to be admitted to the hospital that day, but returned to be admitted the following day after he began throwing up and experiencing heart palpitations and shortness of breath. (Id. at p. 178-79) After various tests and treatments, Alex eventually underwent laparoscopic surgery for a labrum tear in his right shoulder. (Id. at p. 181-83)

Alex asserts claims for violation of his Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, as well as state law claims of assault and battery, false arrest, malicious prosecution, abuse of process, and intentional infliction of emotional distress.

## II.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also, Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 252.

## III.

The Court addresses the remaining state law tort claims[6] before turning to the constitutional claims.

## A.

### (1) Officer Palamaro

While Alex's attorney timely filed a Notice of Tort Claim pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, Officer Palamaro was not named in the Notice, and Alex never

---

[6] Alex concedes that summary judgment is warranted against the non-settling Defendants on the intention infliction of emotional distress claim.

sought to amend his Notice.  Palamaro moves for summary judgment on this basis.  Alex's opposition brief ignores this issue.

The Court holds that all state law tort claims against Palamaro are barred.  *See* N.J.S.A. 59:8-8.

Summary judgment will be granted as to the state law claims against Palamaro.


**(2)  Officer Logan**

Alex "concedes that Officer Logan did not commit an assault and battery of [Alex]." (Opposition Brief, p.  27)  Accordingly, summary judgment will be granted on that claim.

As to the false arrest and malicious prosecution claims, the issue is whether Officer Logan had probable cause to believe that Alex committed the offense of disorderly conduct.  *See Tarus v. Borough of Pine Hill,* 189 N.J. 497, 521 (2007) ("probable cause is an absolute defense to an allegation of malicious prosecution or false arrest")(citing *Wildoner v. Borough of Ramsey,* 162 N.J. 375, 389 (2000)).

The New Jersey disorderly conduct statute provides:

a. Improper behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he

(1) Engages in fighting or threatening, or in violent or tumultuous behavior; or

(2) Creates a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor.

b. Offensive language. A person is guilty of a petty disorderly persons offense if, in a public place, and with purpose to offend the sensibilities of a hearer or in reckless disregard of the probability of so doing, he addresses unreasonably loud and offensively coarse or abusive language, given the circumstances of the person present and the setting of the utterance, to any person present.

"Public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

N.J.S.A. 2C-33:2.

The probable cause inquiry asks "whether at that moment the facts and circumstances within [law enforcement's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Thus, the question becomes, viewing the record facts in the light most favorable to Alex: Did Officer Logan have knowledge of, or reasonably trustworthy information of, facts that would lead a prudent person to believe that Alex recklessly created a risk of public alarm by engaging in violent or tumultuous behavior?  A reasonable factfinder could only conclude yes.

According to Alex's own testimony, he intentionally inserted himself between Andrew and Mrs. Driggs, and was physically restraining Andrew.  This took place very late at night, in a loud, dark and crowded nightclub.  At the time, Officer Logan had no way to know the relationship between Alex and Andrew, nor would he have reason to know that Alex was attempting to diffuse the situation.

Moreover, Officer Logan observed several Harrah's security guards removing Alex from the public area of the nightclub while Alex was admittedly screaming.  (Logan Dep. p. 13; Alex Aksanov Dep. p. 101)  Although Alex now contends that security was not justified in removing him, nothing Officer Logan saw or knew at the time of the incident could have led him to believe anything other than Alex had done something to warrant his removal from the nightclub.

No reasonable factfinder could conclude that Officer Logan lacked probable cause to believe that Alex had committed a disorderly persons offense.  Accordingly, Alex's false arrest and malicious prosecution claims fail as a matter of law.

Additionally, as to the false arrest claim, no reasonable factfinder could conclude on this record that Officer Logan detained (i.e., "arrested") Alex.

First, the Court notes that false arrest is an intentional tort, whereas Alex has been quite clear that his claims against

Officer Logan are grounded in Logan's failure to act, rather than any affirmative action.

More to the point, a reasonable factfinder could only conclude that it was Harrah's security, not Officer Logan, who physically restrained Alex and placed him in a holding cell within the hotel / casino.

Lastly, the record evidence does not support a claim for abuse of process.  The New Jersey Supreme Court has explained,

> [a]n action for malicious abuse of process is distinguished from an action for malicious use of process, in that the action for abuse of process lies for the improper, unwarranted, and perverted use of process after it has been issued while that for the malicious use of it lies for causing process to issue maliciously and without reasonable or probable cause. . . . Thus it is said in substance, that the distinction between malicious use and malicious abuse of process is that the malicious use is the employment of process for its ostensible purpose, although without reasonable or probable cause, whereas the malicious abuse is the employment of a process in a manner not contemplated by law.

*Earl v. Winne*, 14 N.J. 119, 128 (1953).

Alex argues that Officer Logan did have an ulterior motive for issuing a disorderly persons ticket to Alex.  According to Alex's brief, "Officer Logan, by complying with Harrah's request for an issuance of an unwarranted summons against Plaintiff, guaranteed further special employment" for Atlantic City Police Officers at Harrah's.  There is insufficient record evidence to support such an inference.

13

Summary judgment will be granted to Logan as to all state law claims against him.

### (3)  City of Atlantic City

Absent primary liability of Officers Logan and Palamaro, there can be no vicarious liability of Atlantic City. Accordingly, the Court will grant Defendants' summary judgment motion as to the state law claims against Atlantic City.

### B.

### (1)  Fourteenth Amendment Due Process claim against the officers in their individual capacities

Alex argues that Officers Logan and Palamaro violated his constitutional rights when they stood idle while Harrah's security severely beat him.  The Court holds that no constitutional violation occurred, and alternatively, the Officers are entitled to qualified immunity.

Before turning to the legal analysis, however, some initial explanation is in order.

In no way should this Court's holding be construed as condoning the Officers' inaction.  As the Sixth Circuit has observed with regard to these types of failure to intervene cases,

> [w]hen a claimant attempts to hold public officials responsible for private acts of violence under the

14

> Fourteenth Amendment, as this § 1983 action does, the depravity of the fact pattern often is enough to make 'a devil[] sick of sin.' Wilfred Owen, Dulce Et Decorum Est (1918). . . . And when a claimant argues that government officials failed to prevent private individuals from causing another injury, as this § 1983 action does, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and its progeny rarely permit the claim to go forward.

*Jones v. Reynolds*, 438 F.3d 685, 688 (6th Cir. 2006).

Reduced to its core, this Court's holding is only that "the redress [Plaintiff] seeks must come from a source other than the United States Constitution." *Morrow v. Balaski*, 719 F.3d 160, 176 (3d Cir. 2013) (en banc), *cert. denied by* 2013 U.S. LEXIS 9099 (2013); *cf. Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.,* 318 F.3d 473, 478 (3d Cir. 2003) ("Although state tort law might provide a remedy for a state's negligent rescue attempt, it neither logically nor legally follows that federal constitutional law must do the same.").

This Court's decision must be considered not only in view of the claims Alex asserts, but also the claims he has not asserted.

Most notably Alex does not assert-- nor does the record evidence support-- a claim that Officers Logan and Palamaro conspired with Harrah's security to effect Alex's injuries.  On a different record, if a reasonable factfinder could conclude that

state actors conspired with private actors, a constitutional claim might lie.[7]

   *Dwares v. The City of New York*, 985 F.2d 94, 98 (2d Cir. 1993), provides a contrasting example.  In that case, the Court of Appeals reversed the District Court's dismissal of a complaint where the plaintiff alleged that the "defendants had conspired to deprive him of due process."  *Id.* at 97.

   Specifically, the complaint alleged that prior to the incident that caused plaintiff's injuries, "the [police] officers conspired with the [private actors] to permit the latter to beat up [plaintiff] with relative impunity."  *Id.* at 99.  The Court explained, "a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause."  *Id.*

   But here, nothing in the record supports a conclusion that Officers Logan and Palamaro had any sort of prearranged agreement or understanding with Harrah's security regarding what would happen in the event that security physically restrained a patron. In this case the separation between private action and state action is relatively clear.  While the state actors and the

---

[7]  Neither has Alex asserted negligence claims; nor, to the Court's knowledge, has he pursued any internal affairs complaint against the officers.
   Also, despite Alex's testimony that anti-Semitic comments were made by Harrah's security and Officer Palamaro, Alex has not asserted any discrimination claims.

16

private actors were present at the scene at the same time, that

alone does not suffice.

The Third Circuit most recently reiterated the general rule

in *Morrow*:

> [t]he Supreme Court has long established that '[a]s a
> general matter, . . . a State's failure to protect  an
> individual against private violence simply does not
> constitute a violation of the Due Process Clause.' The
> Due Process Clause forbids the state itself from
> depriving 'individuals of life, liberty, or property
> without due process of law, but its language cannot
> fairly be extended to impose an affirmative obligation
> on the State to ensure that those interests do not come
> to harm through other means.'

719 F.3d at 166.

There are two exceptions to the general rule-- the special

relationship and state-created danger doctrines-- but neither

applies here.

The special relationship exception "applies when a special

relationship has been established because 'the State takes a

person into its custody and holds him there against his will.'"

*Morrow*, 719 F.3d at 167 (quoting *DeShaney*).  When the State

affirmatively acts to "'restrain[] the individual's freedom to act

on his own behalf-- through incarceration, institutionalization,

*or other similar restraint of personal liberty*,'" the State may be

liable for failing to protect that individual.  *Id*. at 168

(quoting *DeShaney*; emphasis in *Morrow*).

17

A reasonable factfinder could surely conclude on this record that Alex's personal liberty was restrained.  But what proves fatal to Alex's claim is that a reasonable factfinder could not conclude that the restraint was imposed by the State, i.e., Officers Logan and Palamaro.  Rather, all the record evidence demonstrates that Alex was, at all relevant times, in the custody of Harrah's security.

Similarly, the state-created danger exception does not apply because the record does not support a conclusion that Officers Logan or Palamaro "affirmatively used [their] authority in a way that created a danger to [Alex] or that rendered [Alex] more vulnerable to danger than had the [Officers] not acted at all." *Morrow*, 719 F.3d at 177.

Quite simply, the Officers did nothing.  They had no involvement in the initial scuffle in the nightclub.  They had no involvement in removing Alex from the nightclub.  They did not take Alex into custody.  They stood back and watched as Harrah's security beat Alex.  The fact the beating happened before their very eyes is legally insufficient to trigger a duty to act.  *See Bright v. Westmoreland County,* 443 F.3d 276, 284 (3d Cir. 2006) (holding that probation officer's failure to immediately take steps to revoke probation when the officer "personally witnessed" a violation did not amount to a state-created danger)*; see generally Brown,* 318 F.3d at 479 ("Indefensible passivity, and

18

nonfeasance do not rise to the level of a constitutional violation.") (internal citation and quotation omitted).

While the Officers' inaction is seriously disturbing, a reasonable factfinder could not conclude that the Officers had any influence over how the events of the night unfolded. Nothing in the record suggests that if the Officers had not been there, the outcome for Alex would have been materially less injurious. Indeed, in the Officers' absence, perhaps the outcome would have been worse.

Alternatively, even if a constitutional violation had occurred (which the Court does not hold), the law in this regard was not clearly established in 2008 when the incident occurred.

In reversing the Third Circuit's denial of qualified immunity to police officers in *Carroll v. Carman*, the Supreme Court stated,

> [a] government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate. This doctrine gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.

*Carroll v. Carman*, 135 S.Ct. 348, 350 (2014) (internal citations and quotations omitted).

Here, existing Third Circuit precedent did not establish "beyond debate," *id.* at 352, the Officers' duty to intervene.  The only case that might arguably establish such a duty is *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989), but that case is distinguishable from this case, and therefore creates debatable grounds for finding a constitutional violation.

*Horton* also involved a physical assault which took place in "a private club at which alcoholic beverages were sold."  889 F.2d at 455.  The owner of the club, who was a 18-year police force veteran, "severely beat[]" his employee because he suspected the employee of burglarizing the club.  *Id.* at 456.  Police then arrived at the club to investigate the burglary. *Id.*  After interrogating the employee, the police left, the employee was beaten again, and eventually died from his injuries.

The Third Circuit affirmed the District Court's denial of the defendants' motion for judgment notwithstanding the verdict based on *DeShaney*, which was recently decided at the time.  The Court of Appeals explained that the state "could be liable because the jury could have found that the township had 'delegated . . . its traditional police functions' to the owner of the club" and that "[t]he responding officer 'used his official status to confirm that the owner was free to continue the custodial interrogation." *Morrow*, 719 F.3d at 175 (quoting *Horton*).  Moreover, the township had a written policy of "deferring to private owners with respect

20

to the investigation of crimes in private clubs." *Horton*, 889 F.2d at 456 and 456 n.1.

The facts of *Horton* are not sufficiently analogous to this case to support a conclusion that the law was clearly established with respect to Officers Logan and Palamaro's asserted constitutional duty to Alex.

First, *Horton* involved a private club[8], whereas Harrah's casino and hotel is open to the public.

Second, the circumstances surrounding the beating in *Horton* and Alex's beating differ in at least one significant way.  The injuries the employee suffered in *Horton* took place within the context of a "custodial interrogation," 889 F.3d at 458, concerning a burglary that had already happened, whereas Alex's injuries occurred during an attempt to restrain or detain Alex immediately upon a confrontation occurring in a crowded nightclub. In this case, relatively greater exigency existed as compared to *Horton*.

Lastly-- and in this Court's view, most importantly-- the record here contains no written police department policy from which a reasonable factfinder could conclude that the City of Atlantic City "ceded its police authority," *Morrow*, 719 F.3d at

---

[8]  The written policy in *Horton* explicitly stated that private clubs "are not a public place, and arrests are invalid."  889 F.2d at 456 n.1.

175, to Harrah's security.  Indeed, the undisputed fact that Officer Logan, as opposed to Harrah's security, completed the disorderly persons summons and presented it to Alex weighs against such a finding in this case.

*Horton* could not provide Officers Logan and Palamaro with the clear guidance required for a conclusion that Alex's asserted right to protection under the Due Process Clause was clearly established.  Accordingly, the Court holds that the Officers are entitled to qualified immunity.

Summary judgment will be granted to the Officers as to the Due Process claim.

**(2)  Fourth Amendment excessive force claim against Officer Palamaro in his individual capacity**

Although quoted above, it is worth repeating the *only* piece of record evidence regarding Officer Palamaro's use of force on Alex.  Alex testified at his deposition:

> A:  . . . Rivera put me into the wall, put my torso and my face into the wall, pressed up against the wall *and then Palamaro grabbed me by the cuffs from behind and started pulling, pushing down on the cuffs and with his shoulder slamming my torso into the wall.*
>
> Q: Was [Palamaro] saying anything to you as he was doing this?
>
> A:  Shut-up.
>
> Q:  What were you saying when Palamaro was saying shut up?

A:  I was in pain.

Q:  So did you say anything?

A:   Same, I tore my rotators, my rotators, please take
the cuffs off, my rotators.

Q:  What proceeded to happen next?

A:  . . . Rivera . . . grab[bed] me again and then took
me to the holding cell area.

(Alex Aksanov Dep. p. 130-31)(emphasis added)[9]

According to Alex's own testimony, Officer Palamaro did not
place the handcuffs on Alex, nor was Palamaro the person who
initially pushed Alex up against the wall.  Rather, after Alex was
*already* handcuffed and pressed up against the wall, Palamaro
briefly grabbed Alex by the handcuffs and kept him restrained
where he already was.  A reasonable factfinder could not conclude
on this testimony that Officer Palamaro used more force than
reasonably necessary under the circumstances.  *See Graham v.
Connor*, 490 U.S. 386, 397 (1989) ("the 'reasonableness' inquiry in
an excessive force case is an objective one: the question is
whether the officers' actions are 'objectively reasonable' in
light of the facts and circumstances confronting them, without
regard to their underlying intent or motivation.").

Summary judgment will be granted to Palamaro on the Fourth
Amendment excessive force claim.

---

[9]  Palamaro testified that he did not touch Alex in any way.
(Palamaro Dep. p. 18-19)

**(3)  Atlantic City's *Monell* liability**

Alex asserts two *Monell* claims: that (1) Atlantic City failed to adequately train its officers for special duty assignments like the assignment of Officers Logan and Palamaro to Harrah's hotel and casino; and (2) "Officer Logan's failure to properly investigate and correctly issue a disorderly conduct summons evidences a custom" for which Atlantic City may be liable.

Both claims fail because the Court holds that there was no constitutional violation.  *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."); *Brown*, 318 F.3d at 482 ("The failure of the City and its EMTs to rescue Shacquiel Douglas from privately-caused harm was not an infringement of Appellants' constitutional rights.  There has been no constitutional harm alleged.  Hence, there is no municipal liability under § 1983.").

Additionally, a custom exists "when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' that they operate as law." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007) (quoting *Monell*, 436 U.S. at 690).  Alex's evidence concerning a single incident of issuing a summons cannot establish a custom as a

matter of law.  No reasonable factfinder could conclude that the challenged practice was "permanent" or "well-settled."

Summary judgment will be granted to Atlantic City as to all constitutional claims against it.

## IV.

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted in its entirety.

An appropriate Order accompanies this Opinion.

Dated:  May 29, 2015                    _____Joseph E. Irenas_____
                                        **Joseph E. Irenas, S.U.S.D.J.**